[No. 7297-8-I. Division One. April 7, 1980.]

RAYMOND E. PEDERSEN, ET AL, *Appellants,* v. THE DEPARTMENT OF TRANSPORTATION, ET AL, *Respondents.*

782

*J. Richard Aramburu,* for appellants.

*Slade Gorton, Attorney General, John Kirschner, Assistant, Norm Maleng, Prosecuting Attorney, Thomas Wolfendale, Deputy,* and *Robert McAdams,* for respondents.

JAMES, J.—The plaintiffs, all owners of homes abutting Arrow Lake, filed suit seeking declaratory and injunctive relief to abate a storm water runoff system. After plaintiffs' motion for a preliminary injunction was denied, they sought leave to amend their complaint, adding allegations that the defendants had failed to comply with a federal environmental statute[1] and a King County ordinance.[2] The trial judge permitted the amendment and the defendants moved for partial summary judgment, seeking dismissal of the amended complaint. The trial judge granted defendants' motion. We reverse in part.

The factual matters underlying this appeal are not in dispute. In 1961, the State constructed a pumping station to alleviate flooding over a portion of State Route (SR) 509 (First Avenue South) in the vicinity of Southwest 200th Street. This pumping station used an 800–gallon–per–minute pump to deposit storm water into a drainage ditch which ultimately flowed into Arrow Lake. All the water comes from the Arrow Lake drainage basin, but collects on SR 509 because of the development of the area. ✦

In 1978, the Department of Transportation, the city of Normandy Park, and King County began a project with two purposes. First, SR 509 was widened and channeled with

---

[1]Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* (1976).

[2]King County Surface Water Runoff Policy, King County Code, ch. 20.50.

left turn only lanes. Second, the 1961 storm water runoff system was improved. The new system consists of a holding pond, an oil separator, and two 400–gallon–per–minute pumps. The new system substantially reduces the amount of pollutants flowing into Arrow Lake. This reduction occurs primarily because the holding pond allows settling of particulate matter and some percolation. The system also removes most of the oil from the runoff.

The State did not file an application for a National Pollutant Discharge Elimination System (NPDES) permit with the Department of Ecology as required by WAC 173–220–040. Nor did the State seek approval for the drainage system from King County pursuant to King County Code, ch. 20.50.

■ The Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* (FWPCA) establishes a permit system requiring that any discharge of pollutants be pursuant to a permit issued by either the Environmental Protection Agency (EPA) or an EPA–approved state agency. The Washington Department of Ecology (DOE) has taken over the federal role in issuing permits under the statute. RCW 90.48.260; WAC 173–220; 39 Fed. Reg. 26061 (1974).

■ Pursuant to their rule–making authority under the NPDES program, DOE promulgated the following rule:

No pollutants or other wastes or substances shall be discharged directly to any navigable water of the state from a point source, except as authorized by a permit issued pursuant to this chapter.

WAC 173–220–020. The parties all agree that the storm water runoff system in this case constitutes a point source and that, for the purposes of FWPCA, Arrow Lake is a body of navigable water.

The trial judge's grant of the summary judgment is based upon his interpretation of FWPCA's definitional section, which provides:

The term "discharge of a pollutant" and the term "discharge of pollutants" each means (A) any addition of any pollutant to navigable waters from any point source,

(B) any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft.

33 U.S.C. § 1362(12); WAC 173–220–030(12). He construed this definition as requiring an increase in the amount of pollutants in the water passing through the system. He concluded that because the new system actually decreased the amount of pollutants flowing into Arrow Lake, it did not require a permit. Defendants assert that this conclusion is supported by the holding in *Appalachian Power Co. v. Train,* 545 F.2d 1351 (4th Cir. 1976). We do not agree.

The ultimate objective of FWPCA is the total elimination of the discharge of pollutants into the nation's navigable waters by 1985. 33 U.S.C. § 1251(a)(1). The statutory scheme provides for a modifiable timetable of progressive elimination of pollutants to achieve the ultimate goal. 33 U.S.C. § 1311(b), (c). The functional heart of the scheme is the reviewable permit system to regulate the discharge of pollutants from "point" sources. We hold that the trial judge misconstrued the phrase "any addition of any pollutant" as used in 33 U.S.C. § 1362(12) and WAC 173–220–030(12). Both require a permit if *any* pollutant from a point source is discharged into navigable waters. 33 U.S.C. § 1342; WAC 173–220–020. Applied to storm water runoff systems, the word "addition" means a *discharge* into navigable waters—not an *increase* in the amount of a pollutant introduced into the system.

Defendants' reliance on *Appalachian Power Co. v. Train, supra,* is misplaced. The issue there was not the requirement of a permit. The court invalidated regulations imposing absolute effluent limitations on discharges into navigable waters, holding that plaintiff must be given a credit for pollutants already in the river water diverted for use in its plant.

The storm water runoff system here, however, does not divert water from and reintroduce it into Arrow Lake. Rather, it creates a point source which *collects* pollutant–laden urban runoff and then *discharges* it into the lake.

Regulation of the system provides an opportunity to control the discharge of urban runoff. Under the defendants' analysis, if a system removed any pollutants, it would be exempt from regulation. Such a result would frustrate FWPCA's ultimate purpose.

Our analysis is supported by the current EPA regulations, which provide in part:

> (a) Separate storm sewers, as defined in this section, are point sources subject to the NPDES permit program. Separate storm sewers may be covered either under individual NPDES permits or under the general permit program . . .
>
> (b) *Definition.* "Separate storm sewer" means a conveyance or system of conveyances (including but not limited to pipes, conduits, ditches, and channels) primarily used for collecting and conveying storm water runoff and either:
>
> (1) Located in an urbanized area . . .

40 C.F.R. § 122.45. This regulation was adopted in response to a federal district court ruling that the EPA could not totally exclude storm water runoff systems from the NPDES permit program. 42 Fed. Reg. 6,846 (1977). *See Natural Resources Defense Council, Inc. v. Train,* 396 F. Supp. 1393 (D.D.C. 1975), *aff'd sub nom. Natural Resources Defense Council, Inc. v. Costle,* 568 F.2d 1369 (D.C. Cir. 1977). The regulations also define "discharge of a pollutant" as follows:

> (1) Any addition of any pollutant or combination of pollutants to navigable waters from any point source, . . .
>
> . . .
>
> This definition includes discharge into waters of the United States from: surface runoff which is collected or channelled by man; . . .

40 C.F.R. § 122.3(k)(1), (2), in part. *See also* 40 C.F.R. § 123.2.

We hold that the continued operation of the new Arrow Lake drainage basin system requires a valid permit.

■ Defendants argue alternatively that they are not required to seek an individual permit but may await the

development of a general permit program. Our reading of the applicable federal regulations convinces us that this argument is without merit.

On June 7, 1979, the EPA published a "[f]inal rule" extensively revising the regulations governing the NPDES program. 44 Fed. Reg. 32,854–956 (1979). The rule establishes five new parts of Title 40, Code of Federal Regulations. In the commentary explaining the revisions, the EPA states:

> Under the regulations published today, the basic substantive and procedural requirements applicable to *all* permits are set forth in Parts 122 and 124. Part 123, which *establishes State Permit Program Requirements,* cross–references provisions from those Parts which are applicable to State programs. EPA believes that this new structure will help to simplify the regulations for use by permittees, the States, and the public, and will avoid inconsistencies between State and Federal programs.

(Italics ours.) 44 Fed. Reg. 32,854 (1979). 40 C.F.R. § 123.12 contains a comprehensive cross–reference to parts 122 and 124, itemizing those aspects of the federal regulations that are automatically applicable to state programs. The commentary explaining this section states in part:

> Section 123.12 now combines, in a single section, all the cross–references. In addition, a person reading Parts 122, 124 or 125 should be able to determine, from the context, whether a particular section is applicable to State programs. In case of any doubt, however, § 123.12 is controlling.

44 Fed. Reg. 32,877 (1979). The regulation itself provides in pertinent part:

> (a) State section 402 programs must have legal authority to implement each of the following provisions and must be administered in conformance with each of the following provisions:
>
> . . .
>
> (14) Part 122, Subpart E except §§ 122.40, 122.47(a)–(c) and 122.49—(Special NPDES Programs)—*provided,* States are not required to implement the general permit

program under § 122.48. If a State chooses to issue general permits such action is subject to the following conditions:

(i) Any general permit shall be issued in accordance with § 122.48;

40 C.F.R. § 123.12. Therefore, the federal regulations explicitly make the existence of a general permit program discretionary with the state agency administering the NPDES program.

Examination of the state rules governing the NPDES program reveals that DOE has not adopted a general permit program. *See* WAC 173–220. Absent a duly promulgated rule establishing a general permit program, defendants' reliance on such a program is misplaced.

Policy considerations also militate against adopting the defendants' position. Foremost among these is that the storm water runoff system here is properly subject to regulation. Further, because the inclusion of a general permit program in a state system is entirely discretionary, there is no guaranty that such a program will, in fact, ever be implemented in Washington. Thus, defendants, in effect, ask this court to exempt the storm water runoff system from regulation until such time as DOE adopts a general permit program. Such a judicial exemption is wholly unwarranted. As the court stated in *Costle*:

An exemption tends to become indefinite: the problem drops out of sight, into a pool of inertia, unlikely to be recalled in the absence of crisis or a strong political protagonist.

*Natural Resources Defense Council, Inc. v. Costle, supra* at 1382.

We agree with the trial judge, however, that King County's Surface Water Runoff Policy, King County Code, ch. 20.50, is inapplicable in this case. Although by its terms the surface water runoff policy is applicable to municipal corporations and governmental entities, King County Code 20.50.060 requires submission of plans only "in connection with any of the permits and/or approvals listed in Section

20.50.030 . . ." Because plaintiffs conceded at trial that this project required no permit, submission of a drainage plan was not necessary.

■ King County has also adopted this construction of the ordinance. As the Washington Supreme Court has stated:

> [T]here is the well known rule of statutory interpretation that the construction placed upon a statute by an administrative agency charged with its administration and enforcement, while not absolutely controlling upon the courts, should be given great weight in determining legislative intent. . . . The primary foundation and rationale for this rule is that considerable judicial deference should be accorded to the special expertise of administrative agencies. Such expertise is often a valuable aid in interpreting and applying an ambiguous statute in harmony with the policies and goals the legislature sought to achieve by its enactment.

(Citations omitted.) *Hama Hama Co. v. Shorelines Hearings Bd.,* 85 Wn.2d 441, 448, 536 P.2d 157 (1975).

The trial judge's order granting summary judgment is reversed in part and the case is remanded for further proceedings consistent herewith.

CALLOW, C.J., and RINGOLD, J., concur.

Reconsideration denied July 9, 1980.

Review denied by Supreme Court October 10, 1980.