[No. 13467-1-I. Division One. April 14, 1986.]

RAYMOND E. PEDERSEN, ET AL, *Appellants,* v. THE DEPARTMENT OF TRANSPORTATION, ET AL, *Respondents.*

*J. Richard Aramburu*, for appellants.

*Kenneth O. Eikenberry, Attorney General*, and *John J. Kirschner, Assistant*, for respondent State.

*Wilton S. Viall III*, for respondent Normandy Park.

SWANSON, J.—The appellants, who are owners of property on Arrow Lake in south King County, appeal a judgment awarding a prescriptive easement to the City of Normandy Park and the Washington State Department of Transportation (State) to pump drainage waters into the lake.

The appellant property owners contend that prior pump-

ing by the City and State was permissive and therefore not adverse. In addition, the appellants contend that the trial court erred in imputing community knowledge of the 1961 drainage system to plaintiffs, who are all successors in interest to a common grantor.

This appeal constitutes the second stage of an action that began in April 1978. The plaintiffs (referred to hereinafter as Pedersen, the sole plaintiff to testify at trial) are all owners of property on Arrow Lake, which is located in south King County in the city of Normandy Park. Arrow Lake, which is privately owned, lies several blocks to the northwest of the intersection of 1st Avenue South (SR 509) and S.W. 200th. This intersection, which is within the general drainage basin of Arrow Lake, is located in a small depression that would not drain naturally into the lake. In the late 1950's this intersection became subject to increased flooding, a problem exacerbated in part by growing development in the area.

In late 1961 and early 1962, the State and the City constructed a pumping system (1961 pumping system) near the intersection. The system, which consisted of a series of catch basins that channeled water to a buried concrete cistern, pumped water north through an underground pipe along 1st Ave. S. for several blocks, where it then connected with a cross culvert. This cross culvert conveys drainage waters from the east side of 1st Ave. S. and was the subject of a 1953 easement for this purpose granted to developers by the appellants' predecessor in interest, William H. Albright. From this connection, which is where the 1961 system ends, the water travels northwesterly, passing through an open ditch for several hundred yards and then into another culvert before emptying into Arrow Lake. The 1961 pumping system operated as needed until 1978.

The appellants are all successors in interest to William H. Albright, who purchased the lake and surrounding property in the late 1940's. At that time, the lake was more like a bog, and Albright, during the 1950's, excavated and sold peat from the lake bed with the intention of eventually

developing the property. After various excavations and fillings that changed the level and character of the lake, Albright subdivided and platted the lake and surrounding property in 1966 and began selling lots. Albright continued to live on the lake and sold his last lot in 1976. He died before trial began.

The appellants first raised public objections to the pumping at a July 12, 1973 city council meeting. In 1978, just prior to completion of a new holding pond and pumping system that was to replace the 1961 system, the appellants filed suit, alleging, among other things, that the old and new systems constituted an illegal diversion of water and that both systems illegally used the 1953 private easement. Damages in inverse condemnation were also sought. The complaint was later amended to include three additional allegations, including failure to obtain a National Pollutant Discharge Elimination System (NPDES) permit. In December 1978 the City's motion for summary judgment on the three additional allegations was granted. On appeal, this court reversed on the issue of the NPDES permit. *Pedersen v. Department of Transp.*, 25 Wn. App. 781, 611 P.2d 1293 (1980). In September 1982 an order was issued enjoining any further pumping until an NPDES permit was obtained. An order bifurcating the inverse condemnation claim was issued in December 1982.

The original claims of illegal diversion and unauthorized use of a private easement went to trial in April 1983. On May 10, 1983, the trial court handed down its oral opinion. The court found that the pumping constituted an illegal diversion of water, but concluded that the State and the City had established the elements of a prescriptive easement to pump water into Arrow Lake. The court found that Albright and his successors had never consented to the pumping and that the easement came into existence at the latest by 1974, 10 years after Albright wrote a letter indicating his actual knowledge of the pumping system. The claim for inverse condemnation was then dismissed.

■ Pedersen's first contention is that the trial court

erred in finding that the pumping of drainage water into Arrow Lake was adverse and not permissive. An appellate court will not substitute its judgment for that of the trial court if the findings below are supported by substantial evidence. *Park v. Ross Edwards, Inc.*, 41 Wn. App. 833, 835, 706 P.2d 1097 (1985). Substantial evidence is evidence "of sufficient quantum to persuade a fair-minded person of the truth of the declared premise." *Brown v. Safeway Stores, Inc.*, 94 Wn.2d 359, 373, 617 P.2d 704 (1980).

■■ Although prescriptive rights are not favored in law, a claimant can establish a prescriptive easement upon proof of: (1) use adverse to the right of the servient owner; (2) open, notorious, continuous, and uninterrupted use for the entire prescriptive period; and (3) knowledge of such use at a time when the owner was able to assert and enforce his or her rights. *Bradley v. American Smelting & Ref. Co.*, 104 Wn.2d 677, 694, 709 P.2d 782 (1985); *Dunbar v. Heinrich*, 95 Wn.2d 20, 22, 622 P.2d 812 (1980).

The adverse use required to establish a prescriptive easement

> is such use of property as the owner himself would exercise, entirely disregarding the claims of others, asking permission from no one, and using the property under a claim of right.

*Malnati v. Ramstead*, 50 Wn.2d 105, 108, 309 P.2d 754 (1957).

Proof of element (2), that the use was open, notorious, and continuous, establishes a presumption that the use was adverse, a presumption that can be rebutted by showing that the use was permissive. *Northwest Cities Gas Co., v. Western Fuel Co.*, 13 Wn.2d 75, 85, 123 P.2d 771 (1942). The question of adverse user is one of fact. *Northwest Cities Gas Co.*, at 84.

Pedersen asserts that the State's and City's use of the drainage easement was permissive,[1] that Albright acted out

---

[1] The trial court noted the inconsistency between the claim that the diversion was illegal and the claim that the use was permissive.

of neighborly accommodation, and that the use therefore could never ripen into a prescriptive right. The trial court, however, found:

no evidence that the defendants' use was permissive. Indeed, the circumstances surrounding the defendants' use, together with Mr. Albright's knowledge of and acquiescence in that use, as well as the plaintiffs' knowledge and objections after 1971, rebut any presumption of permissive use by the defendants.

Finding of fact 19.

Albright's 1964 letter to the Normandy Park city manager and his 1964 agreement with the City regarding the outflow from Arrow Lake, which Pedersen claims show permissive use, support the trial court's findings. Although Albright's letter refers to the flow into the lake, the primary thrust involves Albright's plans to lower the lake's level. The letter expresses Albright's acquiescence in the City's pumping:

This letter will help to bring you . . . up to date on my proposed culvert *to control the flow of water out of Arrow Lake.*

. . .

Recently I wrote letters to Mr. McKay . . . concerning . . . storm drainage water entering Arrow Lake . . . Mr. McKay said that the City of Normandy Park had assumed full responsibility for handling the flood water situation at S.W. 200 & 1st Ave. So.

The water collecting at S.W. 200th & 1st Ave. S.W. that is pumped north . . . constitutes diversion of water. *I have never opposed this diversion because there was no other way to handle it.*

. . .

*I have never opposed any system of control of flood water that eventually enters Arrow Lake. There is no other place for it to go.* However, since the City of Normandy Park . . . directly benefits from this handling of flood water, then I think somebody should help me pay the cost of controlling the water flow both into, and out of, Arrow Lake . . . [I, the City, and the sewer district benefit from] my plan to lower the level of the lake . . .

(Italics ours.)

The 1964 agreement, which is associated with this letter, involves only the City's agreement to allow Albright to lower the lake's level by installing an outflow culvert on the City's easement. The agreement was of benefit to both parties but provides no indication that the inflow was somehow permissive.

Finally, the August 19, 1971 letter to the City, signed by Pedersen, Albright, and several of the present appellants, does not support a contention that the pumping was permissive. Rather, the letter, after stating that the 1961 pumping system is "inadequate," expresses concern over recent pollution:

> And in no event can we permit (nor tolerate) the State, County, City or any other party to pump, or otherwise deliver, pollutants into Arrow Lake.
>
> . . . [we] hereby notify you that a tragic . . . condition is in the making. The creek needs immediate cleaning, so as to protect the lake from the next rain. In addition, a longer range remedial plan should be initiated immediately so that our children . . . can enjoy the lake without fear of . . . preventable pollutants.

No effort was made by Albright or his successors to interfere with the pumping into Arrow Lake. Failure of the servient owner to interrupt the user is "strong evidence that the parties thought that the way was used as a matter of right." *Northwest Cities Gas Co.*, at 87. The record reveals no attempt by the City to seek permission to pump into the lake.

Substantial evidence therefore supports the trial court's finding that the pumping of drainage waters into Arrow Lake was adverse and not permissive.

■ Pedersen next challenges the trial court's findings regarding the third element necessary to establish a prescriptive easement: the servient owner's knowledge of the adverse user. The knowledge required may be either actual or constructive:

> An adverse user will not ripen into a prescriptive right unless the owner of the servient estate knows of, and acquiesces in, such user, or unless the user is so open,

notorious, visible, and uninterrupted that knowledge and acquiescence on his part will be presumed.

*Northwest Cities Gas Co.*, at 87.

The trial court found that the 1961 pumping system was open and notorious:

> as of the date the pump began operating in 1961. The fact that the 1961 pump project was intended to alleviate flooding on 1st Avenue South, and that the pump system had been installed, was common knowledge in the community. Normandy Park is a small city and the pump project was of serious import to the community. It was discussed at city council meetings which were open to the public; and the evidence shows that Mr. Albright attended some of those meetings. Consequently, the pumping system was open and notorious as of 1961.

Finding of fact 16.

Testimony at trial amply supports these findings. Several witnesses testified to their knowledge of the 1961 pumping system at the time and to the fact that the system was well publicized in the newspaper and at city council meetings.

On the basis of these findings, the trial court could properly conclude:

> Mr. Pedersen and the other plaintiffs are deemed to have constructive knowledge of the 1961 pumping system based on the court's finding that the existence of the pumping facility was common knowledge in the community at that time.

Conclusion of law 3.

In addition to community knowledge, some parts of the otherwise buried drainage system were visible to public inspection: not only were there several grates and catch basins, but the discharge of water could also be observed in an open ditch, the so–called "Dolackey" ditch, shortly before the water entered Arrow Lake. Courts have imputed constructive knowledge to the servient owner when there have been external indications of an otherwise buried pipe. *See generally* Annot., *Easement by Prescription in Artificial Drains, Pipes, Sewers*, 55 A.L.R.2d 1144 (1957); 25 Am. Jur. 2d *Easements and Licenses* § 48 (1966).

In *Berlin v. Robbins,* 180 Wash. 176, 38 P.2d 1047 (1934), the court imputed knowledge of an underground water pipe to the appellant, who had not lived on the servient estate, on the basis of "community knowledge" of the system and because short sections of the pipe were visible. Although *Berlin* involved an implied easement rather than a prescriptive easement, the underlying rationale of the court is applicable to the case at bar:

> It is not necessary to a knowledge of the existence of a water system that each foot of the pipe line be "open and obvious." Its existence was a matter of common knowledge, and a portion of the pipe connecting with the water system on respondent's land was open and obvious. The test is not whether the pipe line was actually visible its entire length or a large part thereof.

*Berlin,* at 181.

Moreover, it is apparent that the trial court's decision establishing a prescriptive easement does not rest solely on the finding of constructive knowledge. The parties agree that at the latest, William Albright had actual knowledge of the 1961 pumping system in 1964, evidenced by his letter to the City, and that Pedersen and several other appellants had actual knowledge as of 1971, evidenced by their letter to the City. Pedersen contends that because there is no evidence from which constructive knowledge could be imputed to plaintiffs at the time they acquired their lots from Albright, the prescriptive period, which began by 1964, was extinguished and did not begin to run anew until 1971.

To support his argument, Pedersen cites the "general rule" that a bona fide purchaser of land without actual or constructive notice of an easement takes title free from the burden of the easement. This rule does not apply to the instant case, however, because it involves easements that are already in existence at the time of the transfer.[2] At the

---

[2]Moreover, the great weight of authority is that such a rule does not apply to prescriptive easements. 3 R. Powell, *Real Property* ¶ 424, at 34–264 (1984); *see also Riggs v. Ketner,* 299 Ky. 754, 187 S.W.2d 287 (1945).

time Pedersen acquired his property, the prescriptive period had not yet run.

One of the elements required to establish a prescriptive easement is that the servient owner have knowledge of the adverse use *at a time* when he was able in law to assert and enforce his right. *Northwest Cities Gas Co.* This requirement is fulfilled in the instant case. Both Albright and his successors had actual knowledge of the pumping. In 1971, when the appellants had actual knowledge, evidenced by their letter to the City, some 3 years remained in which to assert their legal rights. Suit was not filed, however, until 1978.

■ We have been cited no authority that would support Pedersen's contention that, absent constructive notice, the servient owner must have actual knowledge for 10 full years of the adverse use before a prescriptive easement could arise. Such a requirement would lead to strained, even absurd results if applied to the facts in the instant case. We note by analogy the general rule that the prescriptive period does not begin to run against a servient owner suffering from a disability. *McMillan v. Walker,* 48 Wash. 342, 93 P. 520 (1908); *May v. Sutherlin,* 41 Wash. 609, 84 P. 585 (1906); 2 G. Thompson, *Real Property* § 339, at 173 (1980). The statute of limitations is tolled only if the person suffers the disability "at the time the cause of action accrued". RCW 4.16.190. Once the statute begins to run, however, no subsequent disability will interrupt its operation. *McAuliff v. Parker,* 10 Wash. 141, 38 P. 744 (1894) (adverse possession); *see also Beckman v. Alaska Dredging Co.,* 180 Wash. 321, 40 P.2d 117 (1935); *see generally* 2 G. Thompson, *supra* at 173–79. We therefore agree with the trial court's implicit finding that once the statutory 10–year period began to run against Albright in 1964, it was not tolled or extinguished upon the subsequent transfers of various parcels of the servient estate to the plaintiffs. *Cf. Nicholas v. Salisbury Hardware & Furniture Co.,* 248 N.C. 462, 103 S.E.2d 837 (1958) (for purposes of prescriptive easement, statute not tolled when owner went into receivership and

receiver appointed).

Albright acquired actual knowledge of the pumping system in 1964. The prescriptive period continued as Albright conveyed various parcels of the servient estate. The appellants acquired actual knowledge of the system in 1971, at a time when their rights could still be asserted. The prescriptive easement was therefore established no later than 1974.

Judgment is affirmed.

SCHOLFIELD, C.J., concurs.

WILLIAMS, J. (concurring specially)—There is substantial evidence in the record to support the trial court's findings establishing a prescriptive easement under the criteria set forth in *Bradley v. American Smelting & Ref. Co.*, 104 Wn.2d 677, 709 P.2d 782 (1985). I therefore concur.