355 S.E.2d 624

**FOUR–H ROAD COMM. ASSOC.**

v.

**CHIEF, DIV. OF WATER RESOURCES**
etc. and Omega Mining Co.

No. 17267.

Supreme Court of Appeals of
West Virginia.

March 18, 1987.

Robert F. Cohen, Jr., Cohen, Abate & Cohen, Fairmont, John McFerrin, Charleston, for appellant.

Karen Watson, Charleston, for Water Resources Div.

Gregory Gorrell, Jackson, Kelly, Holt & O'Farrell, Charleston, Robert G. McLusky, for Omega Min.

Larry W. George, Charleston, Patrick C. McGinley, College of Law, W.V.U., Morgantown, for amicus curiae.

NEELY, Justice:

The West Virginia Water Pollution Control Act (*W.Va.Code*, 20-5a-1 to 24) requires any company that wishes to open or abandon a mine that may be expected to produce a water discharge to obtain a Water Pollution Control/National Pollutant Discharge Elimination System permit from the Chief of the Division of Water Resources of the Department of Natural Resources. In 1983 Omega Mining Company applied for and received such a permit for its Deep Mine No. 100 in Monongalia County. The appellants, the 4-H Road Community Association, are landowners in the general vicinity of Deep Mine No. 100 who opposed the issuance of the water permit because, they alleged, safeguards adequate to protect the quality and quantity of surrounding waters were not required. Appellants' primary contention, among others that we shall discuss, is that controlling the pollution from this mine after it is abandoned is so expensive that the mine cannot be operated profitably if the company intends to fulfill its statutory obligation to maintain the quality of adjacent waters.

After the Chief granted the permit both Omega and the Community Association appealed to the Water Resources Board. Omega supported the issuance of the water permit generally, but objected to a condition in the water permit that allowed Omega to extract only fifty percent of the coal in certain portions of the mine. The Community Association objected to the issuance of any permit. The Board first considered the Community Association's appeal, and after two full days of testimony by the Association's witnesses, dismissed the appeal because the Association had not made a sufficient showing that the Chief had acted improperly. Then, in a separate hearing, the Board entertained Omega's appeal. After several more days of testimony, the Board ruled in favor of Omega and entered an order allowing Omega to mine additional amounts of coal using standard room and pillar mining in those areas where the Chief had limited Omega to fifty percent extraction.

The Chief appealed to the Circuit Court of Kanawha County from the second ruling, and the Community Association joined with the Chief. The Community Association also appealed the ruling that the Chief had acted properly in issuing the permit in the first instance. These two appeals were handled by different judges of the circuit

court. By order dated 21 May 1986, Judge Patrick Casey affirmed the Water Resources Board's order that the Chief had properly issued a water permit to Omega and expressly adopted the Water Resources Board's findings of fact and conclusions of law. The Chief's appeal was heard by Judge Robert Smith, who ruled in Omega's favor and affirmed the decision of the Board. Judge Smith's order has not been appealed to this Court.

The Community Association now appeals Judge Casey's decision affirming the order of the Water Resources Board allowing a permit to Omega. The appellants' contend that the circuit court erred when it held that the Water Resources Board was not required to consider the long term cost of controlling water pollution from the Omega mine after the mine is abandoned. In addition, the appellants argue that the circuit court erred when it concluded that the Water Resources Board did not have jurisdiction to consider Deep Mine No. 100's impact on the *quantity* of water in adjacent wells, and that the circuit court should have found that the effluent limits in the permit were inadequate to protect the waters of nearby creeks.

### I

The cynosure of the appellants' case is that the Water Resources Board declined to listen to evidence concerning the long run cost of controlling pollution from Omega's Mine. In a nutshell, appellants argue that the cost of controlling the pollution from the mine is such that it makes mining unprofitable. The incomplete record before the court today is a sprawling mess of highly technical and badly organized material. Apparently designations of the record were made on a hit or miss basis, and it turns out mostly to have been miss. However, the limited record we have before us clearly shows that the Chief gave Omega's permit application detailed consideration; in fact, he required Omega to make significant changes in its initial plan to minimize long term stream pollution.

The issuance of Omega's water permit was the culmination of over one year's work in preparing and reviewing Omega's application. In its original application, Omega proposed to mine 275 acres of coal—many more acres than it is currently allowed to mine under its permit. As a result of conferences with engineering experts in the office of the Chief, Omega deleted reserves from its planned mining operation in order to make its mine "down-dip", or down hill, to prevent water from running by gravity flow directly out of the portal. The primary purpose of this change was to eliminate potential acid mine drainage, which occurs when water flows across pyritic (sulphuric) material in coal in the presence of oxygen. The down-dip design is calculated to allow the mine to flood entirely before any water will be discharged. If, at the time of abandonment, the mine is entirely flooded, the production of acid should be significantly retarded by the lack of oxygen necessary to produce an acidic reaction.

The abandonment plan ultimately accepted by the Chief provided for the sealing of the portal and the installation of valves that will allow periodic release of water within the mine to relieve water pressure should such relief be necessary. This arrangement will allow the mine to flood and force oxygen out of the mine. Mr. G.S. Atwal, an employee of the Chief, testified that this natural treatment system makes it "... very difficult to say whether treatment [of water discharged after abandonment] will be necessary or not ..." On cross-examination Mr. Atwal was able to assert that the mine drainage at the time of abandonment would be low in acid, but he was unable accurately to predict the exact acid content.

### A

The appellants point primarily to the following ruling by the Board to support their contention that the Board failed to consider evidence of economic feasibility:

So I am going to rule that we will limit the economic factors to what appears in the official file and the questions that the Chief is considering and the company is considering at that time and not any

speculation as to how long it is to continue after post mining or what it is going to cost.

■ We agree with the appellants that the economic feasibility of pollution control is an important element to be considered by both the Chief and the Water Resources Board in determining whether to grant a permit. Thus, standing alone the above quoted ruling of the Board would appear to violate the clear requirements of *W.Va. Code*, 20–5A–15(g) [1978], which provides:

> After such hearing and consideration of all the testimony, evidence and record in the case, the Board shall make and enter an order affirming, modifying or vacating the order of the Chief, or shall make and enter such order as the Chief should have entered, or shall make and enter an order approving or modifying the terms and conditions of any permit issued. In determining this course of action, the Board shall take into consideration not only the factors which the Chief was authorized to consider in making his order and in fixing the terms and conditions of any permit, but also the economic feasibility of treating and/or controlling the sewage, industrial wastes or other wastes involved.

Under the facts of this case, however, the ruling of the Board amounted only to a conclusion that the evidence concerning economic feasibility that the appellants wished to introduce was so speculative and unreliable that it was irrelevant to the decision. In fact, in its order ruling on appellee's proposed findings of fact, the Water Resources Board explicitly found as follows:

> The Motion to Dismiss was granted because the appellants were not adversely affected or aggrieved by the appellee, Chief's actions. In addition, at the present time, there was no evidence presented that water quality standards were being violated or that other possible discharges from the Omega mine were polluting State waters and the possibility that pollution might occur on abandonment is highly speculative at this time.

## B

The Water Pollution Control Act is a complicated and, at times, contradictory statute. It attempts to do many things at once, which is only to say that it strives to strike a proper balance among socially desirable, but competing goals. Thus in *W.Va.Code*, 20–5A–1 [1979]—the declaration of policy—the statute says:

> It is declared to be the public policy of the State of West Virginia to maintain reasonable standards of purity and quality of the water of the State consistent with (1) public health and public enjoyment thereof; (2) the propagation and protection of animal, bird, fish, aquatic and plant life; and (3) the expansion of employment opportunities, maintenance and expansion of agriculture and the provision of a permanent foundation for healthy industrial development.

Obviously the expansion of employment opportunities, such as the opening of a coal mine, may conflict with preserving the purity and quality of water. Nonetheless, the statute clearly instructs the Chief and the Water Resources Board to strike a balance between a vibrant economy in which we all live in a sewer and a land of sparkling waters where everyone lives on the dole. One vehicle for striking this proper balance is found in the structure of *W.Va.Code*, 20–5A–5(b)(6) [1978] which requires a *separate* permit from the Chief before a coal mine may be abandoned. The preliminary abandonment plan that Omega submitted with its initial application was only for the purpose of demonstrating to the Chief that abandonment can be accomplished in an acceptable manner. It is not the final abandonment plan, and as technology improves—as it consistently has over the past twenty years—the statute contemplates that newer and better techniques of pollution control will be used as they become available.

■ The appellants attempted to introduce expert evidence about what might happen during the 1,000 years after the mine is abandoned. These speculations concerned such factors as the volume of water discharged, the acid level once the

mine was sealed and flooded, and the cost many years hence of neutralizing any excess acidity that might still be present in water discharged through the valve apparatus. Although the board must receive evidence that would lead it to conclude that a mine cannot be operated under *any circumstances* in a manner consistent with acceptably clean water, the board is not required to hear evidence about the specifics of abandonment when those specifics will be the subject of another exhaustive proceeding many years in the future, and when all the factors bearing on a future abandonment plan cannot yet be known.

Rule 403, *West Virginia Rules of Evidence,* provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

In the context of this lengthy proceeding, involving as it did complex technical issues, we find that the Board's ruling that the appellants' proffered evidence of economic feasibility was speculative came within the "waste of time" and "needless presentation of cumulative evidence" provisions of Rule 403. Appellants did not offer to prove what *would* happen; rather, they attempted to show only what *might* happen. But it is exactly because of the speculative nature of predictions of what will be necessary to avoid pollution upon abandonment that *Code* 20–5A–5(b)(6) [1978] requires the abandonment plan to be approved at the time of abandonment.

## II

■ Appellants' contention that the circuit court erred in holding that the Water Resources Board did not have jurisdiction to consider Mine No. 100's impact on the quantity of water in adjacent wells is also without merit. The circuit court adopted the findings of fact and conclusions of law of the Water Resources Board. The Water Resources Board had granted Omega's and the Chief's Motion to Dismiss on the grounds that the appellants' had not shown a specific injury to their wells and that, if such injury occurred, there was a specific statutory remedy provided outside the permit proceeding.

*W.Va. Code,* 20–5–1a [1967] provides:

It is declared to be the public policy of this State that the water resources of this State with respect to the quantity thereof shall be available for reasonable use by all of the citizens of this State; and that such use shall be subject to the provisions of article five-A [§ 20–5A–1 et seq.] of this chapter.

Nonetheless, the Water Resources Board was correct in concluding that the appellants' complaints concerning possible affects on the quantity of their well water from the operation of Omega's mine were not within the purview of the Chief when considering the permit application. This conclusion was correctly based on the fact that the Surface Coal Mining Reclamation Act, *W.Va. Code,* 22A–3–24(b) [1985] creates a specific entitlement on the part of well users to an adequate water supply when mining affects their wells. That section provides:

"Any operator shall replace the water supply of an owner of interest in real property who obtains all or part of his supply of water for domestic, agricultural, industrial or other legitimate use from an underground or surface source where such supply has been affected by contamination, diminution or interruption proximately caused by such surface-mining operation, unless waived by said owner."

This statute, originally enacted as *W.Va. Code,* 20–6–27, [1980], post-dates the general statement of public policy in *W.Va. Code,* 20–5–1a [1967]. Furthermore, *W.Va. Code,* 22A–3–24(b) [1985], which is now administered by the Department of Energy, clearly contemplates that mining will sometimes dewater wells. The statute creates a specific duty to replace diminished water, and in light of the legislative anticipation of well water depletion and the creation of this specific remedy for the problem under the Mining and Reclamation Act, it is diffi-

cult to understand how appellants can be aggrieved by the Board's holding.

### III

 During the early stages of the permit application process, when the original plans called for an "up-dip" mine, Omega conceded that roughly 45 gallons of water per minute would drain from the mine upon abandonment. However, before issuing the permit the Chief required an entire redesign of the mine to make it a "down-dip" operation with a "dry" rather than "wet" seal. All of appellants' evidence concerning unacceptable effluent limits emerged from drainage figures submitted *in the original application.* Appellants introduced no evidence whatsoever in the hearing before the Board that the design on which the Chief's permit was based would produce effluents that exceeded acceptable limits. Therefore, the Board's failure to revoke Omega's permit on this ground was not clearly wrong.

Accordingly, for the reasons set forth above, the judgment of the Circuit Court of Kanawha County affirming the decision of the West Virginia Water Resources Board is affirmed.

Affirmed.