401 S.E.2d 682

**RAYLE COAL COMPANY**

v.

**CHIEF, DIVISION OF WATER RE-SOURCES, STATE DEPARTMENT OF NATURAL RESOURCES.**

No. 19418.

Supreme Court of Appeals of West Virginia.

Nov. 13, 1990.

Rehearing Denied Feb. 6, 1991.

Roger W. Tompkins, Atty. Gen., Robert D. Pollitt, Deputy Atty. Gen., Environment & Energy Div., Charleston, for State Dept. of Natural Resources.

Jeremy C. McCamic, Wheeling, for Rayle Coal Co.

McHUGH, Justice:

This appeal by the Chief of the Division of Water Resources of the State Department of Natural Resources challenges a ruling of the Circuit Court of Ohio County, West Virginia.[1] The circuit court's ruling reversed a final order of the State Water Resources Board requiring the appellee here, Rayle Coal Company, to apply for a water pollution control permit. We conclude that the circuit court applied an erroneous standard of judicial review to the factual findings of the administrative agency and erred as a matter of substantive law. Accordingly, we reverse the ruling of the circuit court and reinstate the final order of the State Water Resources Board.

I

Valley Camp Coal Company, the predecessor in title to Rayle Coal Company ("Rayle") at the site in question, owned a certain coal mining refuse pile or spoil pile ("gob pile") in conjunction with deep mining operations, including a preparation plant, near Triadelphia, Ohio County, West Virginia, at the head of Storch's Run hollow. Valley Camp constructed a sedimentation pond at the base of this huge gob pile, and such pond collected water runoff and drainage from the gob pile before it entered a body of water known as Storch's Run. The drainage from the gob pile consisted of low pH, high iron and manganese, that is, "acid mine drainage." The effluent from the sedimentation pond was collected and pumped over a hill to Valley Camp's water treatment facility. Valley Camp obtained a water pollution control permit from the Division of Water Resources of the State Department of Natural Resources. Valley Camp's permit allowed the treated effluent from the gob pile to be discharged into a body of water known as Middle Wheeling Creek (into which Storch's Run flows).

Rayle acquired certain property from Valley Camp, including the property on which the aforementioned gob pile was located. Valley Camp's water pollution control permit was not transferable to Rayle. Immediately after acquiring the gob pile area Rayle altered the method of collecting and treating the acid mine drainage from the gob pile. Rather than utilizing the pump and water treatment facility of Valley Camp, Rayle utilized a series of settling ponds and ditches or spillways in the stream bed of Storch's Run.

The State Water Resources Board ("the Board") found that "[t]he discharge [of acid mine drainage] from the Rayle Coal Company facility is permanent"; that the treatment works utilized by Rayle "will not eliminate the discharge from the Rayle Coal Company facility"; and that "[t]he water quality of the discharge [into Storch's Run and Middle Wheeling Creek] from the Rayle Coal Company property is poor."[2] In short, while Rayle's water treatment system has reduced the amount

1. Pursuant to a reorganization and consolidation of state government agencies in 1989, the Division of Water Resources is now the Section of Water Resources and the Department of Natural Resources is now the Division of Natural Resources. *See W.Va.Code,* 5F-2-1(j) [1990]. The now Division of Natural Resources and the State Water Resources Board are parts of the Department of Commerce, Labor and Environ-

mental Resources. *W.Va.Code,* 5F-2-1(b) (13)–(14) [1990].

2. Findings of Fact Nos. 36, 46 and 32, proposed by the Chief of the Division of Water Resources, and adopted by the Board in its supplemented final order. These findings were based upon reports and testimony of inspectors employed by the Division of Water Resources.

of acid mine drainage that would otherwise be discharged from the gob pile into Storch's Run and Middle Wheeling Creek, this system has not eliminated such drainage.

Rayle did not apply for a West Virginia-administered "national pollutant discharge elimination system" water pollution control permit, despite being ordered to do so by the Chief of the Division of Water Resources ("the DWR"). *See W.Va.Code,* 20–5A–10 [1978]. Pursuant to *W.Va.Code,* 20–5A–15 [1978], Rayle appealed the Chief's order to the Board. During several years of administrative proceedings the Board and the DWR *conditionally* authorized Rayle to utilize its water treatment system without applying for a permit. For example, by a letter dated November 4, 1983, the DWR stated:

> In the interest of correcting the existing pollution problem at this site as quickly as possible, the Division stated its willingness to forego the usual first step of requiring a permit prior to remedial action if Rayle agrees to the immediate implementation of interim remedial measures designed to address the pollution problem. We also agreed that Rayle will apply for a water pollution control permit, unless the interim remedial measures eliminate *all* polluting discharges from the site.

(emphasis added) Similarly, in its March 13, 1987 interim order, the Board authorized Rayle to use its water treatment system without applying for a permit, pending the receipt of, and a ruling upon, a "final assessment" report on the efficacy of such system prepared by Rayle. However, in that order the Board stated: "Nothing in this Order may be construed to exempt [Rayle] from any violation of regulations or statutes governing the protection of waters of the State."

After reviewing Rayle's "final assessment" report and water sample data, the Board, in a supplement to its final order, determined that Rayle "is discharging or disposing pollutants from a point source

into the waters of this State and is required to apply for a WV/NPDES permit and to comply with the provisions of West Virginia Code § 20–5A–1 *et seq.*"

On appeal by Rayle the Circuit Court of Ohio County reversed the final order of the Board. The circuit court held: "Because of the agreements made between the parties and the results of the efforts thereof, this Court finds [concludes] that a permit is not required." The Chief of the DWR subsequently brought this appeal.

## II

■ As part of the West Virginia Water Pollution Control Act,[3] and as authorized by the Federal Water Pollution Control Act (sometimes called "the Clean Water Act"), as amended,[4] the State of West Virginia's water pollution control permit program is set forth in *W.Va.Code,* 20–5A–5 to 20–5A–8b, as amended. The language concerning the circumstances under which an application for a permit is required is contained in *W.Va.Code,* 20–5A–5(b) [1978]. The portions of that subsection which are relevant here are as follows:

> (b) It shall be unlawful for any person, unless he [or she] holds a permit therefor from the department, which is in full force and effect, to:
>
> (1) Allow sewage, industrial wastes or other wastes, or the effluent therefrom, produced by or emanating from any point source, to flow into the waters of this State;
>
> . . . .
>
> (3) Acquire, construct, install, modify or operate a disposal system or part thereof for the direct or indirect discharge or deposit of *treated or untreated* sewage, industrial wastes or other wastes, or the effluent therefrom, into the waters of this State, or any extension to or addition to such disposal system;
>
> . . . .
>
> (6) Construct, install, modify, open, re-open, operate or abandon any mine, quarry or preparation plant, or dispose of *any*

**3.** *W.Va.Code,* 20–5A–1 to 20–5A–24, as amended.

**4.** Specifically, 33 *U.S.C.* § 1342 (1988), on state permit programs under the national pollutant discharge elimination system.

refuse or industrial wastes or other wastes from any such mine or quarry or preparation plant: Provided, that the department's permit shall only be required wherever the aforementioned activities cause, may cause or might reasonably be expected to cause *a discharge into or pollution* of waters of the State, except that a permit shall be required for any preparation plant: Provided, however, that unless waived in writing by the chief, every application for a permit to open, reopen or operate any mine, quarry or preparation plant or to dispose of any refuse or industrial wastes or other wastes from any such mine or quarry or preparation plant shall contain a plan for abandonment of such facility or operation, which plan shall comply in all respects to the requirements of this article. Such plan of abandonment shall be subject to modification or amendment upon application by the permit holder to the chief and approval of such modification or amendment by the chief[.]

(emphasis added)[5] Thus, according to *W. Va. Code*, 20–5A–5(b), as amended, an application for a water pollution control permit is required whenever there is a discharge of any amount of "pollutant," treated or untreated, from a "point source" into the "waters" of this state, as these terms are defined in *W. Va. Code*, 20–5A–2, as amended.

■ This requirement is consistent with the provisions of the Federal Water Pollution Control Act.[6] As stated in *Pedersen v. Washington State Department of Transportation*, 25 Wash.App. 781, 611 P.2d 1293 (1980), the ultimate objective of the Federal Water Pollution Control Act is the total elimination of the discharge of pollutants into the nation's navigable waters (broadly defined); such Act provides for a modifiable timetable of progressive elimination of pollutants to achieve the ultimate goal; and the functional heart of the statutory scheme is the permit system to regulate the discharge of pollutants from point

**5.** Pertinent definitions, set forth in *W. Va. Code*, 20–5A–2 [1978, 1990], include:

(e) 'Water resources', 'water' or 'waters' shall mean any and all water on or beneath the surface of the ground, whether percolating, standing, diffused or flowing, wholly or partially within this state, or bordering this state and within its jurisdiction, and shall include, without limiting the generality of the foregoing, natural or artificial lakes, rivers, streams, creeks, branches, brooks, ponds (except farm ponds, industrial settling basins and ponds and water treatment facilities), impounding reservoirs, springs, wells, watercourses and wetlands;

(f) 'Pollution' shall mean the man-made or man-induced alteration of the chemical, physical, biological and radiological integrity of the waters of the state;

....

(x) 'Pollutant' shall mean industrial wastes, sewage or other wastes as defined in this section[;]

....

(h) 'Industrial wastes' shall mean *any* liquid, gaseous, solid or other waste substance, or a combination thereof, resulting from or incidental to any process of industry, manufacturing, trade or business, or from or incidental to the development, processing or recovery of any natural resources; and the admixture with such industrial wastes o[r] sewage or other wastes, as hereinafter defined, shall also be considered 'industrial wastes' within the meaning of this article;

....

(m) 'Treatment works' shall mean any plant, facility, means, system, disposal field, lagoon, pumping station, constructed drainage ditch or surface water intercepting ditch, diversion ditch above or below the surface of the ground, settling tank or pond, earthen pit, incinerator, area devoted to sanitary landfills or other works not specifically mentioned herein, installed for the purpose of treating, neutralizing, stabilizing, holding or disposing of sewage, industrial wastes or other wastes or for the purpose of regulating or controlling the quality and rate of flow thereof;

....

(o) 'Disposal system' shall mean a system for treating or disposing of sewage, industrial wastes or other wastes, or the effluent therefrom, either by surface or underground methods, and shall be construed to include sewer systems, the use of subterranean spaces, treatment works, disposal wells and other systems;

....

(q) 'Point source' shall mean any discernible, confined and discrete conveyance, including, but not limited to, any pipe, *ditch, channel*, tunnel, conduit, well, discrete fissure, container, rolling stock or vessel or other floating craft, from which pollutants are or may be discharged[.]

(emphasis added)

**6.** 33 *U.S.C.* §§ 1251–1387 (1988).

sources. *Id.* at 784–86, 611 P.2d at 1295. In *Pedersen,* the court held that a national pollutant discharge elimination system permit was required for a storm water runoff system collecting and discharging any amount of pollutants into a lake, even though that system reduced the amount of pollutants which would otherwise enter the lake. *See also Burgess Mining & Construction Corp. v. State ex rel. Baxley,* 55 Ala.App. 61, 65, 312 So.2d 842, 845 (evidence that discharges of coal "fines" and sediments into river by coal mining company *exceeded* water pollution *limits* established by state agency was *not* required in order for state to recover civil penalties from mining company for discharging "pollution" *without a prior permit*), *cert. denied,* 294 Ala. 16, 310 So.2d 872 (1975).

■ A case which was nearly identical on its facts to the one now before this Court is *Sierra Club v. Abston Construction Co.,* 620 F.2d 41 (5th Cir.1980). The collecting and channeling of rainwater runoff from coal mining "spoil" piles into sediment basins and ditches, resulting, with gravity flow, in the discharge of acid mine drainage into adjacent streams, were held by the court in that case to constitute a "point source" of pollution under the Federal Water Pollution Control Act.

Rayle claims that *Sierra Club v. Abston Construction Co.* is inapposite to Rayle's disposal system because the gob piles in that case were part of active mining operations, while Rayle here had abandoned mining operations at the site in question immediately upon acquiring the property.[7]

■ The holding in *Sierra Club v. Abston Construction Co.* did not, however, turn on the fact that the spoil piles were utilized in conjunction with active mining operations. Moreover, the West Virginia Water Pollution Control Act does not require an application for a permit only for active business operations. In fact, *W.Va. Code,* 20–5A–11 [1969] provides in relevant part: "When such person is ordered to take remedial action and does not elect to cease

operation of the establishment deemed to be the source of such pollution, *or when such ceasing does not stop the pollution,* he [or she] shall forthwith apply for a permit[.]" (emphasis added) Accordingly, the West Virginia Water Pollution Control Act, *W.Va.Code,* 20–5A–1 to 20–5A–24, as amended, requires an application for a permit when the cessation of business operations does not stop the pollution.

*National Wildlife Federation v. Consumers Power Co.,* 862 F.2d 580 (6th Cir. 1988), upon which Rayle places reliance, is not pertinent. The court held in that case that the operation of a dam to generate electricity and which kills fish does not result in an "addition" or "discharge" of a pollutant. The court rejected the contention that the pollutant added was dead fish. The fish were always in the water. Here, in contrast, the acid mine drainage was not always in the waters of Storch's Run or Middle Wheeling Creek.

■ In light of the foregoing discussion of the applicable statutory and case law, the circuit court erred as a matter of substantive law by holding that an application for a permit was not necessary because Rayle's disposal system had reduced the amount of acid mine drainage.

■ In addition, the circuit court merely substituted its own factual findings for those of the Board. The circuit court emphasized the "final assessment" report, prepared by Rayle, not by the Board. That self-serving report was laudatory of Rayle's disposal system. It did not, however, indicate the *elimination* of the water pollution, and the Board properly gave little, if any, weight to this piece of evidence. The circuit court failed to apply the appropriate standard of judicial review to the Board's factual findings, such as those stated above in section I of this opinion. We stated the standard of judicial review in syllabus point 5 of *Four–H Road Comm. Assoc. v. Chief, Div. of Water Resources,* 177 W.Va. 643, 355 S.E.2d 624 (1987): "The

---

**7.** Rayle intended from the outset to develop virtually all of the property in question for commercial (nonmining) purposes.

findings of fact of the Water Resources Board will not be reversed unless they are clearly wrong."

In the present case the Board's findings are not "[c]learly wrong in view of the reliable, probative and substantial evidence on the whole record[.]"[8] The circuit court did not conclude that the Board's findings of fact were clearly wrong, but, instead, as stated previously, merely substituted its own findings as a basis for the invalid conclusion that an application for a permit was not required because Rayle's disposal system had reduced the amount of acid mine drainage.

■ The circuit court relied upon the fact that the parties had agreed to "interim remedial measures" (the disposal system consisting of a series of settling ponds and ditches) prior to requiring application for a permit. However, as stated above in section I of this opinion, the agreement, as evidenced particularly by the November 4, 1983 letter to Rayle from the DWR, was that Rayle was to apply for a water pollution control permit unless the interim remedial measures eliminated *all* polluting discharges from the site. Rayle has *not* elimi-

nated all such polluting discharges. In fact, as stated previously, the Board found that the discharge of acid mine drainage is essentially "permanent." Finding of Fact No. 36. In addition, the March 13, 1987 interim order of the Board indicated that the authorization to utilize interim remedial measures was not to be construed as exempting Rayle from coverage under the West Virginia Water Pollution Control Act. Because of this reservation of coverage and because Rayle did not comply with the terms of the "agreement" by eliminating all polluting discharges, Rayle's argument that the Chief of the DWR and the Board are estopped from requiring Rayle to apply for a permit is totally without merit.

For the foregoing reasons the final order of the circuit court is reversed, and the final order of the Board is reinstated.[9]

Reversed.

---

**8.** The State Administrative Procedures Act, specifically, *W. Va. Code*, 29A–5–4(g)(5) [1964], sets forth this standard of judicial review of an administrative agency's findings of fact. Under *W. Va. Code*, 20–5A–16(a) [1978], the provisions of *W. Va. Code*, 29A–5–4 are expressly made applicable to the review of West Virginia Water Pollution Control Act cases by a circuit court.

**9.** There is no need for a remand to the Board for Rayle to have another opportunity to be

heard. Prior to issuing its final order, the Board notified Rayle of its impending decision, and Rayle, according to the record before us, did not request an evidentiary hearing. Moreover, the administrative proceedings in this case have transpired over several years, and more administrative proceedings will occur upon application for a permit.