FILED
COURT OF APPEALS
DIVISION II

2013 MAR 19 AM 8: 41

STATE OF WASHINGTON

BY_____
        DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| KYLE WOOD and TAMMY WOOD, husband and wife, | No. 42110-1-II |
| Appellants, | |
| v. | |
| MASON COUNTY, | UNPUBLISHED OPINION |
| Respondent, | |
| MICHAEL DERMOND and NORMA DERMOND, husband and wife; and JOHN DOE, | |
| Defendants. | |

QUINN-BRINTNALL, J. — Kyle and Tammy Wood own property adjacent to Michael Dermond on a 60-foot marine bluff above Totten Inlet in Mason County. In June 2007, Dermond cleared an unattached stump, blackberry bushes, and at least one tree from the portion of his property abutting the bluff face. Approximately 18 months later, a landslide occurred at the bluff's edge during a severe rainstorm. The slide damaged a large section of the Dermond property—including the area Dermond had earlier cleared—and a seven- to ten-foot section of the adjoining Woods' property. The Woods sued Dermond and Mason County alleging, inter

alia, negligent stormwater management, statutory waste, trespass by water, and civil conspiracy. The trial court dismissed all of the claims against the County on summary judgment.

The Woods appeal, arguing that (1) the County is partially liable for Dermond's damage to the bluff because it failed to enforce its resource ordinances; (2) the County committed statutory waste through trespass by water; and (3) after the landslide, the County conspired with Dermond to construct a drainage system without requiring the appropriate permits. Because the County has no liability for Dermond's brush clearing and neither committed statutory waste nor conspired with Dermond to trespass on Woods' property, we affirm.

FACTS

BACKGROUND

In June 2007, Dermond began constructing a storage shed on his marine bluff property above Totten Inlet in Mason County. In preparation for this work, a crew removed trees in the area where the shed would be placed and an excavator dug up tree stumps and removed the brush and groundcover. Dermond also asked the excavator to cut down a cherry tree that was growing up from below the bank of the marine bluff and to remove blackberry bushes and an unrooted tree stump near the bluff's edge. In making the attempt, the excavator accidentally knocked the stump over the side of the marine bluff to the beach below.

Concerned over the activity at the Dermond property, adjacent property owner Tammy Wood called a neighbor and instructed her to contact the County to lodge a complaint. A week later, Mason County Planner Stephanie Pawlawski[1] inspected the Dermond property in response to the complaint. Dermond was not present during the inspection but as far as Pawlawski was

---

[1] Pawlawski married after this lawsuit commenced and is now "Stephanie Andrews." For clarity, we refer to her as "Stephanie Pawlawski" throughout with no disrespect intended.

able to discern, she "didn't see any work that involved a chain saw" near the bluff's edge. Clerk's Papers (CP) at 183. Pawlawski also looked over the bluff's edge and did not see fresh debris, cut trees, or "anything that was a cause for concern." CP at 183. After discerning no code violations, Pawlawski left a letter at Dermond's house informing him of the complaint.

Dermond called Pawlawski as soon as he found the letter to ask whether there was a problem and if he needed to do anything. Pawlawski suggested that Dermond should replant the disturbed area with native ground cover, like kinnikinnick, but did not indicate that any code violations had occurred. Dermond did not tell Pawlawski that he had removed any trees from the property. Pawlawski had no further contact with Dermond after this exchange.

Approximately 18 months later, a landslide occurred at the bluff's edge, damaging a large section of the Dermond property, including the area Dermond had earlier cleared, and a seven- to ten-foot section of the adjoining Woods' property. Over five inches of rain had fallen in the area during the 24-hour period preceding the slide—the type of storm that only occurs, on average, once every 50 to 100 years—and snow on the ground contributed to the unnaturally high water concentrations in the soil. The area of the bluff damaged from the slide was far enough from the Dermond and Wood homes that the homes would not be affected for "the next 30 to 60 years" (CP at 65) and that according to the Woods' geologic expert,

> [f]rom a geologic standpoint - and we're not - I'm not getting into the economics of the slide and the sale price because that's not my area of expertise - no, it's nothing that is going to adversely affect [the Woods'] property significantly into the future.

CP at 65. Although the slide did not immediately threaten the structural integrity of the Woods' home, an appraiser determined that the slide stigmatized the property and devalued it approximately 50 percent.

3

Following the slide, someone again complained to the County about the Dermond property. Mason County Planning Department Enforcement Officer Christine Clark inspected the site and decided to "reopen[] the case for vegetation removal within 50 feet of the buffer and subsequent landslide that's now occurred." CP at 191. Clark informed Dermond that he needed to work with a county planner and a county-approved geologist to create a slope stabilization plan.

Dermond hired geologist William Halbert to design the slope stabilization plan and in February 2009, Halbert met with Dermond and Mason County Senior Planner Allan Borden at the Dermond property. Halbert concluded that to best address slope deterioration, Dermond should collect the stormwater coming from the County culvert under Bloomfield Road in a catch basin and channel it to the beach at Totten Inlet some 700 feet away. Halbert also suggested that Dermond build two additional catch basins on the property and a French drain to collect free-standing surface water and groundwater running downhill toward the bluff. Dermond asked Borden whether permitting would be required for the drainage project; Borden "felt that if [Dermond] had his geologist attest to the proposed drainage being a suitable solution and maintaining as best as possible slope stability, that would be adequate" and that no permits would be required. CP at 149.

Before beginning construction, believing the basin would be within the County's right-of-way for Bloomfield Road, Dermond sought a permit from Mason County Public Works Department to build the catch basin below the County culvert. Mason County District Road Supervisor Larry Forsman inspected the proposed culvert site at the Dermond property and approved the "Road Access Permit" so long as the catch basin was not installed directly onto the culvert and Dermond himself maintained the catch basin.

Dermond constructed the drainage system according to Halbert's plans. During construction, Dermond rendered inoperable the outlet pipe of an unpermitted curtain drain originating on the Woods' property without telling the Woods (or the County).[2]

PROCEDURE

On August 12, 2009, the Woods sued Dermond and the County, alleging that (1) Dermond negligently excavated the area above the bluff, without permits, and this activity contributed to the 2009 landslide, which adversely affected their property value; (2) the County failed to adequately respond to the complaint made to the County about the clearing; (3) the County failed to supervise Dermond's replanting of native vegetation on the bluff and incorrectly concluded that no code violations had occurred; and (4) the County's Bloomfield Road culvert negligently delivers "unregulated" stormwater onto the Dermond property and that water contributed to the landslide. In conclusion, the Woods' complaint stated,

> The mass wasting event and property damage . . . are the consequence of Dermond's . . . negligent and illegal land clearing actions, Dermond's . . . negligent failure to take any steps to control stormwater in the excavated area, Mason County's failure to enforce, and Mason County's stormwater discharge, has caused property damage, including loss of soil and vegetation constituting waste and injury to land and to shrubs and trees under RCW 4.24.630 and has damaged Wood.

CP at 7.

In June 2010, the Woods amended their complaint. In addition to the claims above, the Woods alleged that

> Mason County and Dermond also acted in concert to accommodate Dermond's clearly illegal clearing and grading in a shoreline area, and critical area, and to

---

[2] During the meeting with Halbert, Dermond discovered an outlet pipe for a curtain drain originating on the Woods' property. Dermond assumed the curtain drain pipe must relate to the Woods' septic field. Dermond could find no record of the curtain drain on file with the County.

accommodate the County's illegal dumping of water from its roadway impervious surface at the top of both private parties' property. . . . Dermond agreed to build a drainage system to catch and transport the County's roadway water to Puget Sound. The County required no application or permit, and no engineered plans, and did not obtain the required environmental reviews for this activity, but knowingly allowed Dermond to proceed in violation of the law. The drainage system Dermond installed is partially located on [the Woods'] property. Neither the County nor Dermond requested permission from Woods to install this system on Woods' property, but did so in flagrant trespass of Woods' property.[3]

CP at 17.

The County moved for summary judgment, arguing that the public duty doctrine barred the County from liability, there was no evidence that the County committed statutory waste, and the Woods had failed to present any factual or legal grounds for a civil conspiracy claim. In response, the Woods argued that the public duty doctrine was inapplicable to the case because managing stormwater is a propriety function or, if the public duty doctrine were applicable, the "failure to enforce" exception would create liability for the County. The Woods also argued that the "waste statute," RCW 4.24.630, was applicable because the County intentionally built the culvert below Bloomfield Road and "causing a thing or third person," water in this instance, "to enter the land" implicated the statute. CP at 266. The Woods alleged that "[t]he County is liable for Dermond's acts,"—injuring the Woods' curtain drain and Dermond building his culvert partially on the Woods' land—"because Dermond acted as the County's agent in the management of the County's stormwater." CP at 267. The County responded that "any such claim" related to stormwater damage from the Bloomfield Road culvert "would be barred by the doctrine of prescriptive rights" as the "culvert has been discharging surface water at its present

---

[3] The Woods did not discover that the culvert was built on their property until March 2010, when a property survey they commissioned revealed this.

location (near the Wood/Dermond boundary) for decades, and long before Wood purchased the property in 2001." CP at 326.

After hearing argument on the motion for summary judgment, the trial court dismissed the statutory waste, civil conspiracy, and failure to enforce claims against the County. But because the Woods' response to the County's summary judgment motion arguably alleged a claim for trespass by water, the trial court reserved ruling on that issue.

In January 2011, the trial court heard argument on a renewed summary judgment motion from the County to dismiss the trespass by water claim. The County again argued that the doctrine of prescriptive easement applied and that the evidence in the record established that the County's use of the culvert had been open and notorious for at least 28 years. The Woods argued that the stormwater coming from the culvert constituted a public nuisance and a nuisance cannot become a prescriptive easement or, alternatively, if the County had a prescriptive easement, the County misused the easement in over-discharging stormwater. The trial court granted summary judgment to the County. The Woods timely appeal.[4]

## DISCUSSION

### STANDARD OF REVIEW

We review a trial court's summary judgments de novo. *Torgerson v. One Lincoln Tower, LLC*, 166 Wn.2d 510, 517, 210 P.3d 318 (2009). Summary judgment is appropriate only if the pleadings, affidavits, depositions, and admissions on file demonstrate the absence of any genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. CR 56(c). A material fact is one on which the outcome of the litigation depends in whole or in part.

---

[4] The Woods settled all remaining claims against Dermond out of court.

*Atherton Condo. Apartment-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co.*, 115 Wn.2d 506, 516, 799 P.2d 250 (1990). In a summary judgment motion, the moving party bears the initial burden of showing the absence of an issue of material fact. *See, e.g., LaPlante v. State*, 85 Wn.2d 154, 158, 531 P.2d 299 (1975). "If the moving party is a defendant and meets this initial showing, then the inquiry shifts to the party with the burden of proof at trial, the plaintiff. If, at this point, the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' then the trial court should grant the motion." *Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989) (footnote omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

PUBLIC DUTY DOCTRINE

The Woods argue that the "County owed a duty of care to the Woods as members of the class intended to be protected by the Landslide Hazard Section of the [Mason County] Resource Ordinance." Br. of Appellant at 19. In light of this alleged duty, the Woods argue that the public duty doctrine does not shield the County from being partially liable for the Dermond landslide because (1) the County ordinances evince a legislative intent to protect the property value of property owners like the Woods, and (2) the County failed to enforce code provisions that require mandatory action from the County in the event of noncompliance with the Mason County Resource Ordinance (MCRO). We disagree.

The threshold determination in a negligence action is whether the defendant owes a duty of care to the plaintiff. *Taylor v. Stevens County*, 111 Wn.2d 159, 163, 759 P.2d 447 (1988). And when governmental/municipal liability is at issue, courts employ the public duty doctrine to

8

determine "whether the duty is one owed to a nebulous public or whether that duty is owed to a particular individual." *Honcoop v. State*, 111 Wn.2d 182, 188, 759 P.2d 1188 (1988). The plaintiff in a negligence action has the burden of establishing that a local governmental entity has breached a duty owed to them, individually, rather than to the public at large. *Babcock v. Mason County Fire Dist. No. 6*, 144 Wn.2d 774, 785, 30 P.3d 1261 (2001). Washington courts recognize four exceptions to the public duty doctrine: (1) legislative intent, (2) failure to enforce, (3) the rescue doctrine, and (4) special relationship. *Babcock*, 144 Wn.2d at 786. Only the legislative intent and failure to enforce exceptions are implicated in this case.[5]

A. LEGISLATIVE INTENT

The public duty doctrine does not bar a plaintiff's action if "a regulatory statute, by its terms, evidences a clear legislative intent to identify and protect a particular and circumscribed class of persons." *Ravenscroft v. Wash. Water Power Co.*, 136 Wn.2d 911, 929, 969 P.2d 75 (1998). In order for this exception to apply, "the regulation establishing a duty must intend to identify and protect a particular and circumscribed class of persons, and this intent must be clearly expressed within the provision—*it will not be implied.*" *Ravenscroft*, 136 Wn.2d at 930 (emphasis added). Because the County's ordinance does not clearly express an intent to protect the property value of all property owners who have built in landslide-prone areas, we reject the Woods' contention that this exception to the public duty doctrine applies.

Here, the Woods argue that the "Landslide Hazard Areas" section of the MCRO "creates a duty, owed by the County to landowners in a landslide hazard zone, particularly to owners of

---

[5] The Woods devote a single paragraph in their brief to the special relationship exception with no cognizable argumentation or citation to authority. Accordingly, we do not address this issue. RAP 10.3(a)(6); *see also Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 808-09, 828 P.2d 549 (1992).

property adjacent to development activity, to take reasonable care to enforce the requirements of the ordinance for the protection of the landowners' property." Br. of Appellant at 22. MCRO 17.01.100 states,

> The purpose of the Landslide Hazard Section is to identify areas that present potential dangers to public health and safety, to prevent the acceleration of natural geological hazards, to address off site environmental impacts, and to minimize the risk to the property owner or adjacent property owners from development activities.

Division One of this court rejected a nearly identical argument in *Pepper v. J.J. Welcome Construction Co.*, 73 Wn. App. 523, 871 P.2d 601, *review denied*, 124 Wn.2d 1029 (1994), *abrogated on other grounds by Phillips v. King County*, 87 Wn. App. 468, 943 P.2d 306 (1997), *aff'd*, 136 Wn.2d 946, 968 P.2d 871 (1998). In *Pepper*, plaintiffs asserted that King County was liable for damage from increased surface water runoff from new developments because the King County Code evinced legislative intent to "'protect property owners adjacent to developing land from increased runoff rates which could cause erosion of abutting property . . . and to decrease surface water damage to public and private property.'" 73 Wn. App. 532 (quoting former King County Code 20.50.010 (1980)). In rejecting the "legislative intent" exception to the public duty doctrine in that instance, the *Pepper* court stated that

> general precatory language in a statute does not identify a particular and circumscribed class of individuals. Because the statute referenced here was addressed to a general class of adjacent property owners, and it referenced the public, not a narrow class of specific property owners, the legislative intent exception does not apply.

73 Wn. App. at 532.

Although the language of MCRO 17.01.100 addresses a more specific group of property owners—those whose land falls within a Landslide Hazard Area—than the property owners in *Pepper*, it is unclear from the plain language of the ordinance whether the County intended to

protect the *property value* of property owners adjacent to development activities. For instance, the ordinance begins by focusing on "potential dangers to *public health and safety*." MCRO 17.01.100 (emphasis added). The ordinance does discuss minimizing the risk to adjacent property owners, but it is unclear whether that references minimizing a more general risk to public health and safety or a specific risk to property value. The plain language of the ordinance does not clearly evince the County's intention to protect the property value of land in Landslide Hazard Areas, rather than protecting public health and safety of property owners more generally. We will not read implied intent into the plain language of the ordinance. *Ravenscroft*, 136 Wn.2d at 930; *see also Rosen v. City of Tacoma*, 24 Wn. App. 735, 741, 603 P.2d 846 (1979) (a city building code which does not purport to protect property owners from economic loss will not be treated as affording owners such protection).

As the Woods' own expert geologist attested, the landslide activity on the Dermond property presented no *actual* threat to the Wood property or their health and safety. Instead, the "threat" was to the resale value of the Woods' home. Accordingly, we hold that the "legislative intent" exception to the public duty doctrine does not apply.

B. FAILURE TO ENFORCE

The public duty doctrine also does not bar a plaintiff's action if "(1) the official has a duty to enforce a statute, (2) the official has actual knowledge of a statutory violation, (3) the official fails to correct the violation, and (4) the plaintiff is within the class the statute protects." *Smith v. City of Kelso*, 112 Wn. App. 277, 282, 48 P.3d 372 (2002), *review denied*, 148 Wn.2d 1012 (2003). Here, the Woods argue that the enforcement language in the MCRO creates a duty to enforce and, further, that the County had actual knowledge of a statutory violation. But the

failure to enforce exception to the public duty doctrine only applies when a county or city has a *specific*, mandatory enforcement obligation. Accordingly, we reject this contention.

The plaintiff has the burden of establishing each element of the failure to enforce exception and courts construe the exception narrowly. *Atherton*, 115 Wn.2d at 531. As Division Three of this court has explained,

> In order to invoke this exception, the statute must contain a specific duty to take corrective action. *See, e.g.*, *Bailey* [*v. Town of Forks*], 108 Wn.2d 262, 737 P.2d 1257[, 753 P.2d 523 (1987)] (statute provided police officer "shall" take into custody a person incapacitated by alcohol); *Campbell v. City of Bellevue*, 85 Wn.2d 1, 530 P.2d 234 (1975) (statute provided building official "shall immediately sever any unlawfully made connection"). In other words, a specific directive to the governmental employee as to what should be done must be present in the statute.
> Statutes generally indicating the agency "may" take corrective action or investing broad discretion in the agency will not meet this requirement.

*Ravenscroft v. Wash. Water Power Co.*, 87 Wn. App. 402, 415, 942 P.2d 991 (1997), *aff'd in part by Ravenscroft*, 136 Wn.2d 911.

Here, MCRO 15.13 governs enforcement of the Landslide Hazard section of the MCRO. Unlike the provisions at issue in *Bailey* and *Campbell*, MCRO 15.13's language grants discretion in relation to enforcement: "[t]he enforcement officer *may* issue a civil infraction ticket of up to two hundred fifty dollars for the first violation of the code." MCRO 15.13.020(d); "Prior to other enforcement action, and at the option of the review authority, a warning notice *may* be issued." MCRO 15.13.035; "Where property has been subjected to an activity in violation of this chapter, the county *may* bring an action against the owner of such land or the operator who performed the violation." MCRO 15.13.030(c) (emphasis added).

Thus, although the Woods correctly contend that permits are normally required for clearing within a Landslide Hazard Area, they overstate the County's enforcement obligations.

Contrary to the Woods' claim, the ordinances do not reflect that violation of the ordinance created "a mandatory duty to take specific action." *Forest v. State*, 62 Wn. App. 363, 369, 814 P.2d 1181 (1991). Accordingly, we hold that the failure to enforce exception to the public duty doctrine does not apply in this case.

PRESCRIPTIVE EASEMENT RIGHTS

The County asserts that, as a matter of law, it has established prescriptive rights to discharge stormwater through the Bloomfield Road culvert. The Woods disagree, arguing that the County has failed to present sufficient facts establishing each requirement for prescription or, alternatively, that if the County has established an easement, it has "negligently misused" the easement and is therefore liable for damage from the discharged stormwater. The Woods also argue in the alternative that a public nuisance can never ripen into a prescriptive easement.[6] We hold that the County has established a prescriptive easement, that the County has not misused the easement, and that the Woods' public nuisance claim is meritless.

A. ESTABLISHING A PRESCRIPTIVE EASEMENT

"The burden of proving the existence of a prescriptive right always rests upon the one who is to benefit by its establishment." *Anderson v. Secret Harbor Farms*, 47 Wn.2d 490, 493,

---

[6] The Woods also allege that the County should be barred under CR 8(c) from arguing prescription because the County did not plead prescription as an affirmative defense in its answer. But prescription is not an affirmative defense enumerated in CR 8(c) that must be specially pleaded and, more importantly, the Woods' complaint failed to clearly allege that the County's stormwater was liable for trespass or damage to the bluff. At the time the County became aware of the true nature of the Woods' complaints, it expressly asserted prescription. The Woods had the opportunity to counter the prescription claim at the hearing on the motion for summary judgment and they failed to do so. *See Mahoney v. Tingley*, 85 Wn.2d 95, 100, 529 P.2d 1068 (1975) ("It is to avoid surprise that certain defenses are required by CR 8(c) to be pleaded affirmatively. In light of that policy . . . the affirmative defense requirement is not absolute.").

288 P.2d 252 (1955). To establish a prescriptive easement, the County must show "(1) use adverse to the title owner, (2) open, notorious, continuous and uninterrupted use for 10 years, and (3) the owner's knowledge of the adverse use when he was able to enforce his rights." *Bradley v. Am. Smelting & Refining Co.*, 104 Wn.2d 677, 694, 709 P.2d 782 (1985). The adverse use requirement involves "such use of property as the owner himself would exercise, entirely disregarding the claims of others, asking permission from no one, and using the property under a claim of right." *Malnati v. Ramstead*, 50 Wn.2d 105, 108, 309 P.2d 754 (1957). Proof of the second element (open, notorious, and continuous use) establishes "a presumption that the use was adverse, a presumption that can be rebutted by showing that the use was permissive." *Pedersen v. Dep't of Transp.*, 43 Wn. App. 413, 417, 717 P.2d 773 (1986). Last, a "prescriptive right, once acquired, cannot be terminated or abridged at the will of the owner of the servient estate." *Nw. Cities Gas Co. v. W. Fuel Co.*, 13 Wn.2d 75, 88, 123 P.2d 771 (1942).

Here, the County established through the unopposed declaration of Mason County Road Operations and Maintenance Manager Rick Blake that the Bloomfield Road culvert has operated uninterrupted (and without change) for at least 28 years. Moreover, Tammy Wood's and Dermond's depositions relate that the prior owner of both properties cleared them for development in 1988 and that the culvert has, in plain view, discharged water near the top of the Wood/Dermond property line that entire time. The undisputed facts show that (1) the use in this case is clearly adverse to the servient land owners; (2) the use has been open, notorious, and

uninterrupted for at least 10 years[7]; and (3) the owners' knew the use was adverse but did not attempt to assert their rights within the 10-year period.[8] Accordingly, we hold that the County has established prescriptive rights to discharge water from the Bloomfield Road culvert as a matter of law.

B.     MISUSE OF THE EASEMENT

The Woods argue, in the alternative, that if the County has established prescriptive easement rights as a matter of law, then the County has misused or overburdened the easement. We disagree.

The County's culvert has been draining water at the same location for at least 28 years. The Woods failed to prove that drainage from the culvert changed during that time. Because the County attained the right, through a prescriptive easement, to discharge stormwater through the Bloomfield Road culvert, and because there is no evidence that the County subsequently misused the privileges expressly allowed by that easement, the Woods' claim of negligent misuse is without merit. *Mielke v. Yellowstone Pipeline Co.*, 73 Wn. App. 621, 624, 870 P.2d 1005, *review denied*, 124 Wn.2d 1030 (1994).

---

[7] The Woods appear to allege that the use may have been permissive rather than adverse. However, a presumption of adverse use arises from evidence of open and continuous use for the statutory time period. *Hovila v. Bartek*, 48 Wn.2d 238, 241, 292 P.2d 877 (1956). If the use was open and continuous, as is established here by Blake's declaration, the burden shifts to the servient estate to prove permissive use. *See, e.g., Pedersen*, 43 Wn. App. at 417. The Woods have failed to provide any evidence that the servient owners (themselves and Dermond) permissively allowed the County to discharge stormwater onto their properties.

[8] Although the Woods first purchased their lot in 2001, "an easement obtained by prescription is good as against a subsequent purchaser of the servient tenement even though he is an innocent purchaser without notice." A. M. Swarthout, *Extinguishment of Easement by Implication or Prescription, by Sale of Servient Estate to Purchaser Without Notice*, 174 A.L.R. 1241, § 3 (1948); *see also Crescent Harbor Water Co. v. Lyseng*, 51 Wn. App. 337, 346, 753 P.2d 555 (1988) ("[T]he bona fide purchaser doctrine does not apply to an easement by prescription.").

Moreover, the cases the Woods cite in support of their argument are distinguishable. In *Sanders v. City of Seattle*, 160 Wn.2d 198, 156 P.3d 874 (2007), a mall owner expressly agreed, in writing, to provide for pedestrian access from the mall to a monorail station. In analyzing that agreement, the Washington Supreme Court held that the easement could not be unilaterally *expanded* to require the mall to make its property available as a public gathering place for political protests, especially in that the easement had "not historically served as a public thoroughfare." *Sanders*, 160 Wn.2d at 219. The nature of the easement in question here has not changed and the *Sanders* case is inapplicable.

The Woods also cite to *Lee v. Lozier*, 88 Wn. App. 176, 187, 945 P.2d 214 (1997), in support of the proposition that the County has exceeded the scope of the prescriptive easement. In that case, Division One of our court rejected the Loziers' argument that the essential use of the easement had gone beyond its original purpose because "the easement as ordered by the court granted no more rights than the neighbors believed they already enjoyed." *Lozier*, 88 Wn. App. at 188. Here, by recognizing the prescriptive easement, we recognize no more rights than the County already enjoys: the rights to discharge stormwater through the Bloomfield Road culvert as it has done, unabated, for at least 28 years.[9]

---

[9] Although there is scant Washington case law addressing prescription in relation to stormwater, we addressed a somewhat analogous situation in the context of takings jurisprudence. In Washington, a "new taking cause of action arises when *additional* governmental action occurs." *Hoover v. Pierce County*, 79 Wn. App. 427, 435, 903 P.2d 464 (1995), *review denied*, 129 Wn.2d 1007 (1996) (emphasis added). In *Hoover*, the plaintiffs claimed that while operating a county culvert in the same manner for over a decade, the county was liable for each new instance of flood damage that occurred on their property—despite that the county had not altered the culvert. 79 Wn. App. at 435-36. We disagreed:

> Surface water flooding cases in Washington also support the proposition that a new taking cause of action arises when additional governmental action occurs. In *Buxel* the plaintiff's land was subjected to minor seepage from a system of drains and culverts over a period of years. *Buxel* [v. *King County*], 60

We hold that the Woods' negligent misuse of an easement claim is meritless.

C.    PUBLIC NUISANCE

Also, in the alternative, the Woods argue that the stormwater generated from the Bloomfield Road culvert represents "a public nuisance, affecting the rights of the entire neighborhood." Br. of Appellant at 43. We disagree.

Washington statutorily defines "public nuisance" in RCW 7.48.130: "A public nuisance is one which affects equally the rights of an entire community or neighborhood, although the extent of the damage may be unequal." Further, in RCW 7.48.140(1), (3), and (5), Washington specifically enumerates several nonexclusive instances that give rise to public nuisance claims, including causing the carcass of any animal, "offal, filth, or noisome substance to be collected,

---

Wn.2d [404,] 405, 374 P.2d 250 [1962]. However, in 1958, King County connected an entire subdivision to the drain system, changing the plaintiff's previously minor seepage problem into an inundation problem. *Buxel*, 60 Wn.2d at 405-06. In response to the county's contention that any taking had occurred when the drainage system was first constructed, the *Buxel* court noted that the plaintiff was seeking recovery for the injury that occurred when the county caused the flow of water across her property to increase as a result of the new construction. *Buxel*, 60 Wn.2d at 407.

. . . .

In the present case, the Hoovers do not claim that there was any additional government action by Pierce County since the installation of the culvert in 1972. Rather, they contend that a new taking cause of action arises with each flood, absent additional governmental action. We reject this contention. The Hoovers do not cite, nor did research disclose, any authority for their position. . . .

In summary, the County has not undertaken any new action since installing the roadway culvert in 1972; thus, no new taking cause of action has arisen, and the Hoovers, as subsequent purchasers, may not recover for a taking that occurred prior to their ownership.

*Hoover*, 79 Wn. App. at 435-36.

Here, the County has not undertaken any new action since the roadway culvert was first installed at least 28 years ago. Accordingly, if a cause of action does lie for a taking or for "negligent misuse" of the prescriptive easement, the statute of limitations (10 years) has long since passed as the *Hoover* court explained.

deposited, or to remain in any place to the prejudice of others"; impeding the passage of any river; or carrying on "the business of manufacturing gun powder, nitroglycerine, or other highly explosive substance . . . in any building within fifty rods of any valuable building erected at the time such business may be commenced."

Here, the undisputed facts establish that the alleged "nuisance" at issue only affects two property owners, not an entire neighborhood or community. Further, the Woods are unable to cite to a single case in which stormwater constitutes a public nuisance.[10] Unlike collecting noisome substances, illegally damming rivers, or manufacturing explosives in urban environments, channeling rainwater does not, as a matter of law, rise to the level of public nuisance. The Woods' public nuisance claim fails.

STORMWATER MANAGEMENT

The Woods argue that "[s]tormwater management is a proprietary function" and, accordingly, the County owes the same duty of care as a private individual engaged in the same activity. Br. of Appellant at 17. Although this is true, because the County established a prescriptive easement for discharging stormwater through the Bloomfield Road culvert, the Woods' arguments on this point are inapposite.

"Generally, municipal rights and liabilities as to surface waters are the same as those of private landowners within the city." *Phillips v. King County*, 136 Wn.2d 946, 958, 968 P.2d 871 (1998). Accordingly, managing stormwater is a proprietary function for which a municipality

---

[10] The Woods cite *Elves v. King County*, 49 Wn.2d 201, 299 P.2d 206 (1956). This reliance is misplaced. The *Elves* case involved a town's surface water channels and culverts, but the court based its public nuisance determination on a finding that in violation of RCW 7.48.140(1), "human and animal excreta were found present in the waters collected and diverted on to Plaintiffs' property." 49 Wn.2d at 201. No such issue exists in the present case.

may not be shielded from liability by the public duty doctrine. *See, e.g., Borden v. City of Olympia*, 113 Wn. App. 359, 371, 53 P.3d 1020 (2002), *review denied*, 149 Wn.2d 1021 (2003). Nevertheless, because the County has attained the right, through prescription, to discharge surface water from the Bloomfield Road culvert, the Woods may not now complain of those discharges.

STATUTORY WASTE THROUGH TRESPASS BY WATER

The Woods further argue that the County is liable for statutory waste to their affected portion of the damaged marine bluff through trespass by water. Although Washington recognizes trespass by water and a statutory claim for waste, the County's prescriptive easement bars this claim.

The "waste" statute, RCW 4.24.630(1), provides,

> Every person who goes onto the land of another and who removes timber, crops, minerals, or other similar valuable property from the land, or wrongfully causes waste or injury to the land, or wrongfully injures personal property or improvements to real estate on the land, is liable to the injured party for treble the amount of the damages caused by the removal, waste, or injury. For purposes of this section, a person acts "wrongfully" if the person intentionally and unreasonably commits the act or acts while knowing, or having reason to know, that he or she lacks authorization to so act. Damages recoverable under this section include, but are not limited to, damages for the market value of the property removed or injured, and for injury to the land, including the costs of restoration. In addition, the person is liable for reimbursing the injured party for the party's reasonable costs, including but not limited to investigative costs and reasonable attorneys' fees and other litigation-related costs.

By express operation of the statute, a defendant can only be found liable for "waste" if the defendant acts "wrongfully" and commits an act that exceeds the scope of his or her authorization. Here, the County holds a prescriptive easement that grants it authority to discharge stormwater from the Bloomfield Road culvert—an easement that existed long before the Washington legislature even passed the waste statute. Accordingly, we hold that the

County's easement impliedly authorized the stormwater discharge and the waste statute does not apply.[11]

CIVIL CONSPIRACY

Last, the Woods argue that the County is liable, as a co-conspirator, for Dermond building his drainage project "on the Woods' property, and wrongfully damaging improvements on Woods' land (the curtain drain that protected the Woods' septic field)." Br. of Appellant at 38. Because the record establishes that the County had no knowledge that Dermond's drainage project would be partially constructed on the Woods' property or that Dermond damaged unpermitted improvements on the Woods' land, this argument lacks merit.

To establish a case for common law civil conspiracy, the Woods needed to show by *clear, cogent, and convincing evidence* "that (1) two or more people combined to accomplish an unlawful purpose, or combined to accomplish a lawful purpose by unlawful means; and (2) the conspirators entered into an agreement to accomplish the conspiracy." *All Star Gas, Inc. of Wash. v. Bechard*, 100 Wn. App. 732, 740, 998 P.2d 367 (2000). Moreover, "[t]o preclude summary judgment, a nonmoving party may not rely solely on speculation and argumentative assertions. Upon the submission by the moving party of adequate affidavits, the nonmoving party must set forth specific facts to rebut the moving party's contentions and show that a

---

[11] Although the concept of trespass includes trespass by water, *see Hedlund v. White*, 67 Wn. App. 409, 418 n.12, 836 P.2d 250 (1992), Washington courts have yet to acknowledge that statutory waste can occur through trespass by water. And legislative history would caution against such an application. When the Washington Senate was first debating the waste statute, Senator Owen explained that "the idea is to deal with the tremendous amount of damage that we are having with people coming in and shooting up signs, shooting up restrooms. In the case of forest lands, shooting up trees, taking four-wheel drives and running them all over [agricultural] land and ripping up the ground. You know a variety of things like that is really what we are getting after in this situation." SENATE JOURNAL, 53rd Leg., Reg. Sess., at 154 (Wash. 1994).

genuine issue as to a material fact exists." *Allard v. Bd. of Regents of Univ. of Wash.*, 25 Wn. App. 243, 247, 606 P.2d 280, *review denied*, 93 Wn.2d 1021 (1980). Finally, to successfully establish civil conspiracy, a plaintiff must show that the factual circumstances supporting the conspiracy are "inconsistent with a lawful or honest purpose and reasonably consistent only with the existence of the conspiracy." *John Davis & Co. v. Cedar Glen No. Four, Inc.*, 75 Wn.2d 214, 224, 450 P.2d 166 (1969).

Here, the record clearly establishes that no one, let alone the County, realized that Dermond's plans for his drainage project involved partially constructing a catch basin on the Woods' property until a May 2010 survey revealed this, more than a year after the County met with Dermond to inspect the site. Furthermore, the Woods themselves admitted that they had no evidence of a conspiracy between Dermond and the County and uncontroverted evidence in the record establishes that Dermond never discussed with the County the Woods' unpermitted drain pipe that he damaged during construction of his own drainage project.[12]

Washington—or any other jurisdiction we are aware of—does not recognize a claim for "negligent conspiracy." Without establishing any support for their claim of the County's unlawful intent, the Woods' civil conspiracy claim against the County necessarily fails. At the time Dermond sought permits from the County to build his drainage project, neither he nor the County were aware that a portion of the land affected by the project would be on the Woods' land. The Woods themselves did not realize this. Accordingly, the Woods' civil conspiracy claim is meritless.

---

[12] We note, as well, that when a county's only action is to approve a private development—as occurred here—the county will not be liable for the developer's negligence. *See, e.g., Pepper*, 73 Wn. App. at 531; *Phillips*, 136 Wn.2d at 962.

No. 42110-1-II

Having failed to present material issues of fact supporting negligence or civil conspiracy on the part of the County, or rebutting clear evidence that the County had attained the right through prescriptive easement to discharge stormwater through the Bloomfield Road culvert, we affirm the trial court's summary dismissal of the Woods' claims.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

QUINN-BRINTNALL, J.

We concur:

PENOYAR, J.

WORSWICK, C.J.